UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

VERONICA NICKEY,

                   Plaintiff,

     - against -

THE CITY OF NEW YORK, Detective PATRICK
COWARD, Detective ROBERT CARBOINE,
Detective DAVID RAS, Lieutenant SEAMUS
McHUGH, JOHN DOE, and JANE DOE,

                   Defendants.

------------------------------------------------------------X

**MEMORANDUM & ORDER**
11-CV-3207 (RRM) (RLM)

ROSLYNN R. MAUSKOPF, United States District Judge.

     Plaintiff Veronica Nickey commenced this action on July 5, 2011, alleging civil rights violations based on injuries sustained in the course of an allegedly unlawful arrest.  (*See* Doc. No. 1.)  On August 31, 2011, plaintiff filed an amended complaint omitting those claims and instead alleging causes of action for federal constitutional violations and state law torts stemming from her allegedly unlawful arrest and prosecution.  (*See* Doc. No. 7.)  Before the Court are the parties' cross-motions for summary judgment pursuant to Fed. R. Civ. P. 56.  (Doc. Nos. 23–28.)  Oral argument on the motions was held on September 20, 2013.  For the reasons that follow, and based on the record at oral argument, defendants' motion for summary judgment is granted in part and denied in part.  Plaintiff's cross-motion for summary judgment is denied in its entirety.

1

# BACKGROUND[1]

On June 27, 2008, Ellison Butler – also known as "Rhino" – found himself in Brooklyn's Lincoln Terrace Park looking to join a pick-up game of basketball.  He came across a group of individuals including Dillon Rickman, one of Rhino's friends, Damian Searles, a neighborhood acquaintance, and Kendrick Austrie.   Teams were already chosen, however, and Rhino waited to play the next game.

About halfway through the game in progress, a black female walked across the court toward Rhino and engaged him in conversation.  Eventually, however, words were abandoned −− a shot rang out, and both Rickman and Searles looked over to see the woman holding a small black handgun and Rhino holding the front area of his body.

Spectators began to run and Rhino ran across basketball court and onto the sidewalk, heading toward the park bathrooms.  According to Rickman, the woman chased after Rhino, waving the gun and shouting, "This is what you get for messing with my daughter."  Rickman then saw the woman, together with a black male, run out of the park toward Buffalo Avenue, and enter a building on East 96th Street and East New York Avenue.  Rickman went over to Rhino, saw that he was bleeding, and called the police.  Rhino later died from his injuries.

Rickman described the shooter as a black female in her thirties, between five-foot six and five-foot eight, weighing approximately 140 to 150 pounds, with dreadlocks, wearing a white t-shirt with tan pants.  The only description of the male was that he was black with dreadlocks.

---

[1] Unless otherwise indicated, these facts are undisputed and presented in the light most favorable to plaintiff.

Rickman accompanied police on a canvass of the neighborhood a few days after the shooting and identified the building where the female and male entered following the shooting – as the investigation would reveal, Veronica Nickey had a residence in that building.

Damian Searles was interviewed the day of the shooting, and his description of the events was largely consistent with that of Rickman. Searles described the shooter as a woman having a medium complexion and "loose dreads." Searles told the officers that immediately following the gunshot, the shooter said to Rhino, "You can't fuck with my children" and "Don't fuck with my children" before exiting toward Buffalo Avenue. However, Searles recalled another *woman* with the shooter, describing both as "butch like" in appearance. Searles remembered seeing both women run out of the park toward Buffalo Avenue and enter a building on East 96th Street and East New York Avenue.

Kendrick Austrie, another park witness, described the female shooter as 23 to 35 years old, five-foot five to five-foot six, 125 to 140 pounds, with dark skin and dreadlocks. He had never seen her before. In contrast to the description given by Rickman, Austrie's description of her clothing included a light colored stocking cap, three-quarter length light blue pants, and a normal colored shirt.

On July 8, 2008, Rickman viewed a photo array that included a photograph of Veronica Nickey. Here, because of the limited scope of the evidence provided on summary judgment, the story becomes muddled. Rickman positively identified a picture of Nickey – that much is clear. What is *unclear*, however, is the substance of that identification. Did Rickman identify Nickey as someone he knew generally *from the park*? Or, as the defendants maintain, did Rickman positively identify Nickey *as the woman who shot Rhino in the park?* The cold record,

3

consisting of testimony given both at the time of murder and in this litigation, as well as relevant documentary evidence, contains limited and seemingly contradictory information as to exactly how it was that Rickman knew Veronica Nickey.

Whatever its substance, this photo identification served as the basis to arrest Veronica Nickey on July 8, 2008 for the murder of Ellison Butler. On that day, Veronica Nickey was forty-one years old, approximately five-foot four and 130 pounds, and wore her hair in cornrows, not dreadlocks. She was arrested at a residence she maintained at 14 East 96th Street, the building identified by Dillon Rickman as the location into which the shooter, accompanied by a black male, had fled

Immediately following her arrest, Nickey was placed in two line-ups, one viewed by Kendrick Austrie, who could not identify anyone, and the second viewed by Dillon Rickman who did, in fact, select Veronica Nickey. Once again, however, from the excerpts of the record evidence provided on summary judgment, it is unclear as to the context of Rickman's identification – whether Rickman merely recognized Nickey as someone from the park, or as the shooter of his friend Rhino.

On July 9, 2008, Coward signed a criminal complaint initiating the prosecution. Roughly one month later, on August 7, 2008, plaintiff was indicted by a grand jury on murder and weapons possession charges. For reasons that are not contained in the record, all charges against plaintiff were dismissed approximately fifteen months later. Following her release, plaintiff unsuccessfully attempted to recover a necklace and earrings that had been confiscated after her arrest. To date, that property has not been returned.

About the investigating officers, Nickey asserts that "once they set their sights on the plaintiff they closed all other leads of investigation [and] worked with bad faith to secure a conviction against an innocent person." In support of this claim, she points to evidence obtained during the investigation, the chronology of which is hardly clear from the record presented on summary judgment. She notes that the police learned that Rhino had previously associated with a woman known as "V," who lived somewhere in the vicinity of Lincoln Terrace Park and had two children, neither of whom was fathered by Rhino. Rhino and "V" had a somewhat sordid history, with allegations that Rhino may have assaulted "V" at some point in the past. Rhino's girlfriend also recounted to the police that Rhino had publicly argued with an unidentified woman on 96th Street several weeks prior to the shooting.

Nickey notes that she herself was quite well known in the neighborhood (and "loud" and "nosey"), has never been known as "V," and that she has four children. Unlike the shooter as described by the witnesses, she claims she never wore her hair in dreadlocks, and that she was heavier and almost a decade older. She also points to the interview of her minor daughter Atalia, who claims she was across from the park the day Rhino was shot, and says she spoke to her mother by cell phone shortly after hearing the gunshots. According to Atalia, her mother told her that she was in downtown Brooklyn at the time, and the two spoke twice in order to locate one another to meet in the area. Nickey complains that the officers failed to pull her cell phone records to corroborate her whereabouts at the time of the murder. [2]

---

[2] Defendants also note that in May 2009, Nickey's defense attorney served notice of alibi in the criminal case, based on the testimony of 10th grader Christian Nickey, who appears to be plaintiff's nephew. According to the alibi notice, on the day of the murder, Christian was picked up by Veronica Nickey and her younger sister Valerie and driven to Lincoln Terrace Park to meet his cousins, including Atalia. Valerie confronted Rhino who was standing in the park with eight or nine men. Christian reported hearing Rhino say, "Who the fuck are you bitch? Get the fuck out of my face." Rhino grabbed Valerie and a brief tussle ensued. Valerie pulled a gun from her waistband in the rear of her shorts. Veronica began to scream as she and Christian stood at a distance. Valerie shot the gun twice,

Nickey does not highlight other portions of the police investigation. According to police reports, Atalia also told her mother and other witnesses that she had known Rhino from the park for about a year, and had been having problems with him, including an incident in which Rhino followed her while she was walking arm in arm with a boy, asked if that was her boyfriend, and showed her a knife when she rebuffed him. However, in an affidavit prepared in connection with this litigation, Atalia now claims that she never told the police or her mother that she had problems with Rhino.

Also after this lawsuit was filed, Nickey's counsel in this matter visited Rickman, who was incarcerated on a state case. Rickman signed two affidavits stating in substance that he "ha[d] never ever told any person, including but not limited to any police officers, district attorneys or media reporters/journalists that [he] witnessed [plaintiff] commit any type of crime" and that he "never, ever said or inferred that she had anything to do with the murder of Ellison Butler." Rickman's affidavits also stated that the police and District Attorney's office had attempted to coerce him to testify falsely against plaintiff. On February 28, 2012, counsel for defendants sought to depose Rickman in connection with these affidavits. During the brief deposition, however, Rickman refused to cooperate or answer all but the most general of questions. Rickman also stated that, should the case proceed to trial, he would refuse to testify even if compelled by a court order. When asked whether the statements in his affidavits were true and accurate, Rickman responded only "I refuse to testify" and "I don't know." Rickman indicated that he provided the affidavit to Nickey's counsel because counsel offered to help him with Rickman's own criminal case.

---

and possibly tried to shoot more with the gun jamming. Christian saw the men with Rhino ran, one dropping a gun that another picked up. Rhino was slumped over with two men helping him stand. Valerie fled in her car, Veronica ran to her home crying and screaming, and Christian ran to his grandmother's house.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At this stage, the evidence of the nonmovant "is to be believed" and the court must draw all "justifiable" or reasonable inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).

The nonmoving party, however, "may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with specific facts showing there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted) (emphasis in original). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted).

**DISCUSSION**

The amended complaint alleges primarily that defendants violated plaintiff's constitutional rights in contravention of 42 U.S.C. § 1983. (*See* Am. Compl. (Doc. No. 7) ¶¶ 27–34.) Plaintiff also brings related state law claims for conversion of certain personal property confiscated at the time of her arrest, intentional infliction of emotional distress, and negligent infliction of emotional distress.[3] (*See id.* ¶¶ 32–49.) The Court first addresses plaintiff's federal claims.

**I. Section 1983 Claims**

Plaintiff alleges that defendants deprived her of rights guaranteed under the Fourth and Fourteenth Amendments when they (1) unlawfully arrested, detained, and imprisoned her; (2) maliciously prosecuted her; and (3) conspired to deprive her of constitutionally protected rights.[4] (Am. Compl. ¶¶ 27–34.) Each of these claims is discussed in turn.

**A. False Arrest**

Plaintiff first alleges that defendants violated her rights "[b]y unlawfully arresting, detaining, [and] imprisoning . . . plaintiff without justification." (*See* Am. Compl. ¶ 28.) "A

---

[3] Plaintiff's amended complaint also mentioned the use of "excessive force" and "negligence" based on her treatment at the 77th Precinct following her arrest. (*See* Am. Compl. ¶ 2.) There are no further facts alleged as to that conduct, however, and no cause of action pled for either excessive force or negligence. (*See id.* at ¶¶ 27–49.) As such, the Court does not read the amended complaint as raising those claims.

[4] Plaintiff's constitutional claims are brought pursuant to 42 U.S.C. § 1983. In relevant part, that section provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "Section 1983," however, "is only a grant of a right of action; the substantive right giving rise to the action must come from another source." *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir. 1995), *cert. denied*, 517 U.S. 1189 (1996) (citing *Adickes*, 398 U.S. at 150). Here, plaintiff grounds her claims in the Fourth and Fourteenth Amendments.

[section] 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995), *cert. denied*, 517 U.S. 1189 (1996)) (internal citation omitted).  In order to prove a claim for false arrest, "plaintiff must show that: (1) the defendant intended to confine h[er], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975), *cert. denied*, 423 U.S. 929 (1975); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (citing *Broughton*); *Weyant*, 101 F.3d at 852 (same).

 "[P]robable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under [section] 1983." *Weyant*, 101 F.3d at 852 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)) (internal citation omitted).  Probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent [person] in believing that the [arrestee] had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S. 103, 111–12 (1975) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

 By its very nature, probable cause defies definitive delineation.  As the Supreme Court has observed,

> Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part.  But the mistakes must be those of reasonable [persons], acting on facts leading sensibly to their conclusions of probability.  The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests.

420 U.S. at 112 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)); *see also United States v. Ventresca*, 380 U.S. 102, 108 (1965) (citing *Draper v. United States*, 358 U.S. 307, 311 (1959)) ("[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract.").  Courts have consistently held that "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Brewton v. City of New York*, 550 F.Supp.2d 355, 365 (E.D.N.Y. 2008) (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

In general, probable cause exists where officers know or are aware of reasonably trustworthy information suggesting facts or circumstances sufficient to permit a reasonably prudent person to believe an arrestee has committed or is committing a crime. *See, e.g.*, *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979); *Wong Sun v. United States*, 371 U.S. 471, 479 (1963); *Brinegar*, 338 U.S. at 175–76; *Weyant*, 101 F.3d at 852.  Generally, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubt as to the person's veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer*, 63 F.3d at 119) (internal citation omitted).

A probable cause determination is based on the totality of the circumstances, *see Gates*, 462 U.S. at 230–32; *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citing *Wilson v. Layne*, 526 U.S. 603, 614 (1999)), and constrained to "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest."[5] *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).  And

---

[5] Probable cause also need not exist for the charge "actually invoked by the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 154 (2004).  Rather, an arrest is privileged "if there was probable cause to arrest . . . for any single offense." *Marcavage v. City of New York*, 689 F.3d 98, 109–10 (2d Cir. 2012)).  In this case, defendants have offered no evidence to suggest probable cause to arrest for any offense other than those charged.

10

when the facts material to a probable cause determination are undisputed, the matter is a question of law properly decided by the Court. *See, e.g.*, *Weyant*, 101 F.3d at 852; *Singer*, 63 F.3d at 118–19.

Here, however, summary judgment cannot be granted as the record evidence contains gaps and seeming inconsistencies as to the existence of probable cause for Nickey's arrest. Defendants maintain that "the police had probable cause to arrest plaintiff based on information provided to them by an eyewitness to the shooting." (Defs.' Mem. in Supp. (Doc. No. 25) at 6.) In this regard, defendants rely exclusively on the identifications of plaintiff purportedly made by Rickman through a photo array and line-up, both of which included plaintiff. (*Id.* at 6–8.) Indeed, there is no dispute that Dillon Rickman selected plaintiff in both the photo array and lineup. However, as discussed at length at the oral argument held on this motion on September 20, 2013, the record on summary judgment contains seemingly inconsistent evidence regarding *from where* Rickman recognized plaintiff. Without belaboring the issues here, and resting on the detailed record made at oral argument, the Court cannot conclude from the record presented on summary judgment if Rickman identified plaintiff as the person "*who shot the boy Rhino in the park*," or whether he simply recognized plaintiff "*from the park*." This goes to the very heart of the probable cause inquiry, as defendants concede that Rickman's identification of plaintiff as the shooter was the sole basis for plaintiff's arrest. Given these seeming inconsistencies, the Court cannot grant summary judgment on plaintiff's claim for false arrest.[6]

### B. Malicious Prosecution

---

[6] In reaching this conclusion, and those that follow, the Court in no way relies on the affidavits or deposition testimony of Dillon Rickman submitted by plaintiff in opposition to the instant motion.

Plaintiff also alleges that defendants "maliciously prosecuted [plaintiff] for approximately fifteen months until the dismissal of the case on September 22, 2009."[7] (*See* Am. Compl. (Doc. No. 7) ¶ 11, 31–32.) "To sustain a [section] 1983 claim of malicious prosecution, a plaintiff must demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty." *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003) (citing *Singer*, 63 F.3d at 116–17). Under New York law, the tort of malicious prosecution requires plaintiff to show "(1) that the defendant commenced or continued a criminal proceeding against h[er]; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Kinzer*, 316 F.3d at 143 (citing *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)); *see also Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y. 1983).

Plaintiff's arrest alone "cannot serve as the predicate deprivation of liberty because it occurred prior to h[er] arraignment and without a warrant, and therefore was not 'pursuant to legal process.'" *Singer*, 63 F.3d at 117 (quoting *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)); *see also Sankar v. City of New York*, 867 F.Supp.2d 297, 310 (E.D.N.Y. 2012), *recons. denied*, 2012 WL 2923236 (E.D.N.Y. July 18, 2012). To successfully pursue a section 1983 claim for malicious prosecution, plaintiff must show some deprivation of liberty as a result of a proceeding that rises to the level of a constitutional violation. *See Singer*, 63 F.3d at 117 (citing *Memphis*

---

[7] A malicious prosecution action implicates the Fourth Amendment "right to be free of unreasonable seizures of the person – *i.e.*, the right to be free of unreasonable or unwarranted restraints on personal liberty." *Singer*, 63 F.3d at 116; *see also Albright v. Oliver*, 510 U.S. 266, 274 (1994) (noting that "the Fourth Amendment's relevance to the deprivations of liberty that go hand in hand with criminal prosecutions"). "[S]ince the gist of a claim for malicious prosecution is abuse of the judicial process, a plaintiff pursuing such a claim under [section] 1983 must show that [a] seizure resulted from the initiation or pendency of judicial proceedings." *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997). That a seizure occurred is not in dispute here.

*Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 309 (1986)).  Thus, the defendant officers' alleged involvement in plaintiff's arrest alone cannot form the basis of liability for malicious prosecution.

"Under New York law, police officers can 'initiate' prosecution by filing charges or other accusatory instruments."  *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (citing *Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).  Consistent with New York law, proceedings in this case were instituted by the filing of a felony complaint.[8]  (*See* Francolla Decl., Ex. M.)  The sole signatory to that complaint was Coward.  (*Id.*)  As such, and given the issues raise above with regard to probable cause, plaintiff's malicious prosecution claim survives, at least with respect to the initiation of the prosecution.

However, "under New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"  *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon*, 468 N.Y.S.2d at 456) (emphasis in original).  "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment."  *Savino*, 331 F.3d at 73 (citing *Bernard v. United States,* 25 F.3d 98, 104 (2d Cir. 1994)).

Moreover, plaintiff's malicious prosecution claim cannot be predicated on conduct occurring during or after the proceedings before the grand jury.  In *Rehberg v. Paulk*, 132 S. Ct. 1497 (2012), the Supreme Court held that "a grand jury witness has absolute immunity from any

---

[8] A felony complaint is the procedure used to initiate proceedings prior to an indictment.  *See* N.Y. Crim. Pro. L. §§ 100.05, 100.10(5); *People v. Samuels*, 400 N.E.2d 1344, 1346 (N.Y. 1980) ("By statute a criminal action now commences with the filing of an accusatory instrument, which includes a felony complaint.") (internal citations omitted).

§ 1983 claim based on the witness' testimony" and that "this rule may not be circumvented . . . by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." *Id.* at 1506. As a result, plaintiffs can no longer base malicious prosecution claims solely on the theory that an officer lied to the grand jury or use an officer's grand jury testimony to rebut the probable cause presumption. *See Carr v. City of New York*, No. 11-CV-6982, 2013 WL 1732343, at *5 (S.D.N.Y. Apr. 19, 2013) ("[T]his presumption cannot be overcome by alleging that a police officer lied before the grand jury given the absolute immunity accorded grand jury witnesses."). However, plaintiffs may still bring claims based on allegations of bad faith conduct outside the grand jury. *See Del Col v. Rice*, No. 11-CV-5138, 2012 WL 6589839, at *14 n.19 (E.D.N.Y. Dec. 18, 2012) ("While *Rehberg v. Paulk* holds that grand jury testimony cannot be the sole basis for a § 1983 claim, courts have allowed malicious prosecution claims to proceed, where malicious prosecution claims are based on more than false grand jury testimony."); *see also Matthews v. City of New York*, 889 F.Supp.2d 418, 439-41 (E.D.N.Y. 2012) (allowing claim to proceed based on alleged use of a coerced confession); *Carr*, 2013 WL 1732343, at *6 (noting that *Rehberg* does not protect allegedly false statements made in a criminal complaint).

In addition, arresting officers generally are not subject to liability for malicious prosecution because the ultimate decision to prosecute rests with the prosecutor. *See Myers v. Cnty. of Nassau*, 825 F.Supp.2d 359, 367 (E.D.N.Y. 2011); *Llerando-Phipps v. City of New York*, 390 F.Supp.2d 372, 383 (S.D.N.Y. 2005). Although "New York courts have indicated that continued detention after facts sufficient to exonerate the accused have been provided . . . could give rise to an action for malicious prosecution," *Benjamin v. United States*, 554 F. Supp. 82, 86

(E.D.N.Y. 1982); *see also Dirienzo v. United States*, 690 F. Supp. 1149, 1158 (D. Conn. 1988), once the grand jury indicted plaintiff, control of the prosecution passed to the District Attorney's Office and was no longer within the authority of the police. *See Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994); *Burt v. Aleman*, No. 05-CV-4493 (NGG), 2008 WL 1927371, at *5 (E.D.N.Y. Apr. 30, 2008). For the defendant officers to be liable after the District Attorney had assumed control of the prosecution, plaintiff must offer evidence that the police continued to take an active part in the proceedings, beyond participation as mere witnesses, by insisting on or urging the continuation of what the officers knew to be a groundless prosecution. *See Dirienzo*, 690 F. Supp. at 1158.

These principles, coupled with the record on summary judgment, limit plaintiff's malicious prosecution claim to the initiation of the proceedings by felony complaint sworn to by Coward. First, plaintiff has failed to rebut the presumption of probable cause created by her indictment. Plaintiff never sought the grand jury minutes that led to her indictment and has failed to offer any evidence that her indictment was procured by fraud, perjury, suppression of evidence or other police misconduct, or was in any way infected by the issues surrounding the identifications by Rickman.[9] Second, *Rehberg* precludes any claim based on the officers' testimony before the grand jury or to any "preparatory activity" that occurred between witness and prosecutor. *See* 132 S. Ct. at 1499. Third, plaintiff has offered no evidence that the

---

[9] Indeed, even if the officers falsely claimed for purposes of plaintiff's *arrest* that Rickman identified plaintiff as the shooter, it is hard to fathom how that testimony could have infected the *grand jury proceeding*. Hearsay is not allowed in a state grand jury proceeding, *see People v. Huston*, 668 N.E.2d 1362 (N.Y. 1996) (observing that, generally, hearsay evidence is inadmissible before the grand jury), nor is third-party testimony concerning a line-up identification. *See* N.Y. Crim. P. L. § 60.25; *People v. Buie*, 658 N.E.2d 192, 197 (N.Y. 1995) ("[I]n the context of eyewitness identification, the testimony of a third party (typically, a police officer) to the effect that the witness identified a defendant as the perpetrator on some prior occasion is generally inadmissible . . . ."); *see also Jelinek v. Costello*, 247 F.Supp.2d 212, 274 (E.D.N.Y. 2003) (noting that "[t]his rule, with modifications, has been codified by New York Criminal Procedure Law section 60.25").

defendant officers insisted on, or urged the continuation of, what they knew to be a groundless prosecution. As such, plaintiff's malicious prosecution claim cannot extend past her indictment, unless plaintiff can demonstrate some bad faith conduct extrinsic to the grand jury proceedings that perpetuated her prosecution.

Plaintiff attempts to so do by suggesting that information obtained by the police, coupled with further investigation, should have revealed that "there was no nexus between the plaintiff and the victim, the crime[,] or the crime scene" and that "there was absolutely no way [a] criminal proceeding could have succeeded." (Pl.'s Mem. in Opp. at 15.) Plaintiff also urges that "once [defendants] set their sights on the plaintiff[,] they closed all other leads of investigation to secure a conviction against an innocent person." (*Id.* at 16.) These arguments are insufficient to carry plaintiff's burden.

Here, "there was no definitive evidence in the authorities' possession that could have proven" that plaintiff did not commit the crime in question. *Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 129 (2d Cir. 2009). It is not enough for plaintiff to argue as she does merely that a criminal prosecution would not have been successful. Nor is it sufficient for plaintiff to suggest that defendants myopically focused their investigation on plaintiff, as omissions or errors by the police do not overcome the presumption of probable cause. *Cf. Gil v. Cnty. of Suffolk*, 590 F.Supp.2d 360, 370 (E.D.N.Y. 2008) ("Any alleged failure to conduct further investigation or apply all procedures that could have been followed does not amount to fraud, bad faith or the suppression of evidence and is insufficient to overcome the presumption."); *Zahrey v. City of New York*, No. 98-CV-4546 (DCP) (JC), 2009 WL 54495, *15 (S.D.N.Y. Jan. 7, 2009), *am. in part on recons.*, 2009 WL 1024261 (S.D.N.Y. Apr. 15, 2009)

(quoting *Ramos v. City of New York*, 729 N.Y.S.2d 678, 692 (N.Y.App.Div. 2001)) ("To whatever extent individual officers failed to follow some leads or failed to accurately take notes evinces only carelessness rather than malice.").

Of course, in some cases probable cause present at the time of arrest may later dissipate if the discovery of some intervening fact reveals the charges to be groundless. *Lowth*, 82 F.3d at 571 (citing *Callan v. State*, 532 N.E.2d 96 (N.Y. 1988)). Although plaintiff argues that this is such a case, she has failed to show that probable cause was somehow vitiated during the time between her arrest and the initiation of criminal proceedings, and even up to the time charges against her were dismissed. Plaintiff urges that the defendant officers' investigation was unduly narrow, but the police were "not obliged to exonerate plaintiff or uncover exculpatory evidence." *Lawrence v. City Cadillac*, No. 10-CV-3324 (PKC), 2010 WL 5174209, at *6 (S.D.N.Y. Dec. 9, 2010). Instead, the question is whether the officers' purported failure to investigate "so far departed from what a reasonable person would have undertaken as to itself constitute evidence of lack of probable cause." *Rae v. Cnty. of Suffolk*, 693 F.Supp.2d 217, 227 (E.D.N.Y. 2010) (citing *Lowth*, 82 F.3d at 571). Plaintiff has offered no evidence that meets this threshold.

For the reasons discussed above, the only basis for a malicious prosecution claim here centers on the probable cause available at the time Coward initiated proceedings by way of felony complaint. In all other respects, summary judgment as to this claim is granted.

## C. Conspiracy

To the extent that Nickey alleges a conspiracy, based on allegations that the individual defendants acted in concert or conspired to violate her constitutional rights (*see* Am. Compl. ¶ 29), this claim must also fail. Plaintiff provides no facts to indicate the existence of a conspiracy,

and additionally the "intracorporate conspiracy doctrine" bars a conspiracy claim between members of the same corporation or municipality acting within the scope of their employment. *See, e.g., Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002) (describing elements of conspiracy claim); *Farbstein v. Hicksville Pub. Library*, 254 Fed. App'x. 50, 51 (2d Cir.-2007) (dismissing claim because of "legal impossibility of pleading conspiracy by exclusive reference to actions of employees of a single corporation"); *Dunlop v. City of New York*, No. 06-CV-433, 2008 WL 1970002, at *9 (S.D.N.Y. May 6, 2008) ("The intracorporate conspiracy doctrine posits that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other."). Thus, no viable conspiracy claim lies.

## II. Qualified Immunity

Under certain conditions, police officers may be entitled to qualified immunity from suits for civil damages that allege violations of federal law. *See, e.g.*, *Connell v. Signoracci*, 153 F.3d 74, 79–80 (2d Cir. 1998). Here, the protective mantle of qualified immunity falls away only if the arrest or prosecution was "so lacking in indicia of probable cause" as to render an officer's belief in its existence unreasonable. *Malley v. Briggs*, 475 U.S. 335, 345 (1986); *Magnotti v. Kuntz*, 918 F.2d 364, 368 (2d Cir. 1990). When the undisputed facts concerning an officer's actions, together with the inferences properly drawn from those facts, demonstrate that the officer is entitled to qualified immunity, the question is properly decided on a motion for summary judgment. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987). However, because "[t]he qualified immunity analysis is inextricably linked to the scope of the officers' pre-arrest investigation," *Sankar*, 867 F.Supp.2d at 307–08, the same factual disputes that preclude

18

summary judgment on the substance of plaintiff's claims for false arrest and malicious prosecution also prevent summary judgment as to qualified immunity. *See McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006).

### III.    Municipal Liability

Plaintiff has also alleged municipal liability. (*See generally* Am. Compl. ¶¶ 21–49.) "Local governing bodies . . . can be sued directly under [section] 1983 for monetary, declaratory, or injunctive relief where . . . the action [] alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). In order for a municipality to be liable in such an action, a plaintiff must prove "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra*, 48 F.3d at 685 (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

However, "a municipality cannot be held liable under [section] 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Thus, even if proven, an isolated instance of unconstitutional conduct by individual officers is not sufficient to impose municipal liability. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability."); *Sankar*, 867 F.Supp.2d at 308 ("[M]unicipal liability cannot be predicated only upon the isolated unconstitutional acts of individual officers."). "Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability . . . ." *Batista*, 702 F.2d at 397 (citing *Monell*, 436 U.S. at 694

n.58). "Causation for purposes of *Monell* liability is akin to proximate causation in tort law," *Lojan v. Crumbsie*, No. 12-CV-0320 (LAP), 2013 WL 411356, at *3 (S.D.N.Y. Feb. 1, 2013) (citing *Cash v. County of Erie*, 654 F.3d 324, 342 (2d Cir. 2011), *cert. denied*, 132 S.Ct. 1741 (2012)), but will attach only if the "moving force behind [a] violation was an official policy or custom." *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (citing *Monell*, 436 U.S. at 690–94).

Plaintiff has offered no evidence of any official municipal policy or custom sufficient to impose liability on the City. Indeed, even the amended complaint alleges only a purported failure to "properly sanction or discipline" the officers involved. (*See* Am. Compl. ¶¶ 21–22.) Plaintiff "may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment. *Scotto*, 143 F.3d at 114. Moreover, a failure to act "satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)); *see also Jenkins v. City of New York*, 478 F.3d 76, 95 (2d Cir. 2007). Because plaintiff has adduced no evidence of any deliberate indifference on the part of the City or its officials; any systemic failure to train, supervise, or discipline officers; or any other official policy or custom causing constitutional injury, summary judgment for the City must be granted.

## IV. Supplemental State Law Claims

Finally, plaintiff brings supplemental state law claims alleging conversion of personal property confiscated from plaintiff, intentional infliction of emotional distress, and negligent

inflication of emotional distress.[10]   Defendants do not seek dismissal on substantive grounds.

Rather, they rest on plaintiff's failure to comply with N.Y. Gen. Mun. Law § 50-i, which states

that "it shall appear by and as an allegation in the complaint or moving papers that at least thirty

days have elapsed since the service of [the notice of claim] . . . and that adjustment or payment

thereof has been neglected or refused . . . ."[11]   *Id.* § 50-i(1)(b).   While it is true that the amended

complaint is deficient in this regard, defendants' motion is nonetheless denied.

The pleading requirement contained in section 50-i applies in federal court.   *See, e.g.*,

*McCluskey v. Town of Southampton*, No. 12-CV-2394 (SJF) (ETB), 2013 WL 4049525, at *15

(E.D.N.Y. Aug. 9, 2013).   Generally, "[t]he failure to include in the complaint an accurate

allegation that at least 30 days have elapsed since the service of the notice and that the

adjustment or payment of the claim has been neglected or refused require[s] that the complaint

be dismissed."   *Perkins v. City of New York*, 810 N.Y.S.2d 218, 220 (2d Dept. 2006).   However,

in certain circumstances, "the pleading deficiency can be cured by an amendment after the

requisite time has passed."   *Id.*; *see also., Bravo v. City of N.Y.*, 505 N.Y.S.2d 647 (2d Dept.

1986) (pleading deficiency excused where defendant its Answer specifically conceded requisite

facts).   Amendments are routinely granted, particularly where the notice of claim was timely

filed, and the municipality suffered no prejudice.   *See, e.g., Fitzgibbon v. Cnty. of Nassau*, 491

N.Y.S.2d 266, (2d Dept. 1985) (although motion to amend to include 50-i notice initiated more

---

[10] This Court exercises jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

[11] Originally, defendants also argued that plaintiff's state law claims must be dismissed in light of plaintiff's failure to comply with N.Y. Gen. Mun. Law § 50-h.  (*See* Defs.' Mem. in Supp. at 20–22.)  After again reviewing their correspondence with plaintiff, however, defendants discovered that they had mailed their notice demanding a section 50-h hearing to the wrong attorney.  (Defs.' Reply at 10.)  Defendants have now withdrawn that argument.  (*Id.*)

than one year and 90 days after the cause of action accrued, abuse of discretion to deny amendment in the absence of any demonstrable prejudice to defendants).

Here, there is no dispute that plaintiff timely filed her notice of claim, and that due to defendants' conceded error, a 50-h hearing never took place. Defendants have not raised one fact or argument suggesting that they have been prejudiced by plaintiff's failure to plead the magic words required by 50-i. As such, their motion to dismiss plaintiff's state claims is denied, and the Amended Complaint is deemed amended to satisfy the 50-i requirement. *See Bravo*, 505 N.Y.S.2d at 648 (complaint deemed amended in exercise of court's discretion).

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. No. 23) is denied as to plaintiff's claims for (1) false arrest under section 1983 and (2) malicious prosecution with respect to the initiation of the prosecution. Defendants' motion is granted as to all other claims. Plaintiff's cross-motion for summary judgment is denied in its entirety.

This matter is recommitted to Magistrate Judge Roanne L. Mann for continued pretrial supervision, including preparation of a Joint Pre-Trial Order, and settlement discussions if warranted.

SO ORDERED.

Dated: Brooklyn, New York
     September 27, 2013

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge